**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Matthew J. Zevin (SBN 170736)
mattz@lcllp.com
Connor J. Porzio (SBN 351998)
connor@lcllp.com
1234 Camino Del Mar
Del Mar, CA 92014
Tel:    619-762-1910
Fax:    858-313-1850

*Attorneys for Plaintiffs and
Proposed Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| PAMELA CHO, and MARIA EAGLE, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE GAP, INC., a Delaware corporation, GAP (APPAREL) LLC, a California limited liability company, GAP INTERNATIONAL SALES, INC., a Delaware corporation, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 4:24-cv-05206-HSG<br><br>**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**[DEMAND FOR JURY TRIAL]**<br><br>Dept.:    Courtroom 2<br>Judge:    Hon. Haywood S. Gilliam, Jr. |

Plaintiffs Pamela Cho and Maria Eagle bring this action, on behalf of themselves and all others similarly situated, against Defendants The Gap, Inc., Gap (Apparel) LLC, and Gap International Sales, Inc. (collectively, "Gap Factory" or "Defendants") and state:

## I.    NATURE OF THE ACTION

1.    "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society." *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971). This principle is as true today as it was over 50 years ago when it was penned by Justice Mosk writing for a unanimous California Supreme Court. This putative class action is about holding a multimillion-dollar

company accountable to its customers who have been deceived by a years-long campaign to trick them into paying more for Gap Factory's fashion merchandise through the widespread and perpetual use of false reference and discount pricing. "In short, the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin et al., *Competition and the Regulation of Fictitious Pricing*, 87 J. Mktg., 826, 835 (2023) ("Staelin").

2.     Prices reflect a perceived value to consumers.[1] False advertising of prices are used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendants lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer advertises discounts off of some higher, made-up, and artificially inflated "original" price that no one ever pays.

3.     At all relevant times, Defendants have continually advertised false price discounts for merchandise sold throughout their Gap Factory outlet stores and online at gapfactory.com. In bringing this putative class action complaint, Plaintiffs seek to remedy this deception and its attendant harm to consumers. Plaintiffs seek monetary damages, restitution, and declaratory and injunctive relief from Defendants arising from their false discounting scheme on apparel, accessories, shoes, and other items sold in their Gap Factory outlet stores and their e-commerce website, gapfactory.com.

4.     False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the market price for these products by raising consumers' internal reference price and in turn the perceived value consumers

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. Pub. Pol'y & Mktg. 52, 55 (1992) ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann et al., *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. Retailing 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendants, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

5.     The following example of a hypothetical DVD seller, which parallels Defendants' practice, illustrates how false reference pricing schemes harm consumers: the seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at which the seller could regularly make a profit. Instead, however, the seller creates a fake "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at 90% off, creating a (fake) "sale" price of $10.00. Consumers purchase the DVD for $10.00 believing they got a "good deal" since it was previously sold—i.e., valued by others in the market—at an "original" price of $100.00, and presumably would be again soon.

6.     The consumer's presumption and purchase stem directly from the seller's deception. If the seller did not employ a false referencing pricing scheme, it would not be able to sell many, if any, DVDs at $10.00 because the true market value of the DVD is $5.00. However, the false reference pricing scheme enables the seller to fabricate an increase in consumer demand for the DVD through the reasonable, but incorrect, **perceived value** of the DVD ($100.00) in connection with the substantial discount of $90.00. The net effect of myriad consumers' increased willingness to pay $10.00 for the DVD. Thus the seller artificially inflates the market price for the DVD to $10.00 by advertising the false "original" price and corresponding fake discount.

7.     Through their false and misleading marketing, advertising, and pricing scheme alleged herein, Defendants violated, and continue to violate, California, Oregon, and federal law. Specifically, Defendants violated and continue to violate: California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq* (the "CLRA"); Oregon's Unlawful Trade Practices Act (the "UTPA"), Or. Rev. Stat. §§ 646.605, *et seq.*; and

---

[2] Dhruv Grewal & Larry D. Compeau, *supra* note 1, at 55. ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

the Federal Trade Commission ("FTC") Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

8.    Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who have purchased one or more items advertised at a purported discount from a fictitious higher reference price from Gap Factory outlet stores and gapfactory.com. Plaintiffs intend to halt the dissemination and perpetuation of this false, misleading, and deceptive pricing scheme, to correct the false and harmful perception it has created in the minds of consumers, and to obtain redress for those who overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiffs also seek to permanently enjoin Defendants from engaging in this unlawful conduct. Lastly, Plaintiffs seek to obtain all applicable damages, including actual, compensatory, benefit of the bargain, statutory, and punitive; equitable restitution; reasonable costs and attorneys' fees; and other appropriate relief in the amount by which Defendants were unjustly enriched as a result of their sales of merchandise offered at a false discount.

## II.    JURISDICTION AND VENUE

9.    This Court has original jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Classes (defined below) have a different state citizenship from Defendants.

10.    The Northern District of California has personal jurisdiction over Defendants because Defendants conduct business in the State of California and have principal executive offices located in California. Defendants conduct business with sufficient minimum contacts within California, or otherwise intentionally avail themselves to the California market through the operation of their Gap Factory outlet stores within the State of California

11.    Venue is proper under 28 U.S.C. § 1391(b)(1) & (2) because Defendants' principal place of business is within this District and because a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated, within this District.

### III.    GENERAL ALLEGATIONS

**A.    Retailers Benefit from False Reference Pricing Schemes.**

12.    Defendants engage in a false and misleading reference price scheme in the marketing and selling of their merchandise at their Gap Factory outlet stores and e-commerce website, gapfactory.com.

13.    Retailers like Defendants can and do benefit substantially from false discounting schemes because "framing a price increase as a discount can not only allow the firm to get ***higher margins***, but also ***increase sales***." Staelin, *supra*, at 835 (emphasis added). This is because consumers use advertised reference prices to make purchase decisions, particularly when the information available to consumers can vary among different types of products.[3] Most often, as with retail clothing, consumers lack full information about the products and, as a result, often use information from sellers to make purchase decisions.[4]

14.    Defendants' deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendants' deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby, & Edi Karni, *Free Competition and the Optimal Amount of Fraud*, 16 J. Law & Econ. 67, 68-69 (1973).

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson, *Information and Consumer Behavior*, 78 J. Pol. Econ. 311, 311-12 (1970).

[5] Dhruv Grewal & Larry D. Compeau, *supra* note 1, at 54; *see also* Richard Thaler, *Mental Accounting and Consumer Choice*, 4 Mktg. Sci. 199, 212 (1985) ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection).").

[6] Dhruv Grewal & Larry D. Compeau, *supra* note 1, at 52.

[7] Peter Darke & Darren Dahl, *Fairness and Discounts: The Subjective Value of a Bargain*, 13 J. of Consumer Psych. 328, 328 (2003).

"transaction utility" by Nobel Prize-winning economist Richard Thaler, consumers place value on the psychological experience of obtaining a product at a perceived bargain.[8]

15.    Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumers' internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their

---

[8] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler, *supra* note 5, at 205.

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer, *An Empirical Analysis of Internal and External Reference Prices Using Scanner Data*, 19 J. of Consumer Rsch. 62, 68.

[10] Glenn E. Mayhew & Russell S. Winer, *supra* note 9, at 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal et al., *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*, 62 J. of Mktg 46, 48 (1998).

[12] As Thaler notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler, *supra* note 5, at 212.

[13] Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, 18 J. Pub. Pol'y & Mktg. 3, 7 (1999) [hereinafter *Pricing and Public Policy*].

[14] Gurumurthy Kalvanaram & Russell S. Winer, *Empirical Generalizations from Reference Price Research*, 14 Mktg. Sci. 161, 161 (1995); *see also* Jerry B. Gotlieb & Cyndy T. Fitzgerald, *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. 6 J. of Applied Bus. Rsch. 59, 65-66 (1990). ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

16.    In *Competition and the Regulation of Fictitious Pricing*, published just last year, authors Richard Staelin, a Duke marketing professor since 1982, Joel Urbany, a Notre Dame marketing professor since 1999, and Donald Ngwe, a senior principal economist for Microsoft and former marketing professor for Harvard, built on their prior analytic work to explain the effects of false reference pricing schemes and why their use has not dissipated as previously expected by the FTC, but rather have become more prevalent in the absence of FTC enforcement actions. Importantly, this new study cites and confirms many of the same older consumer studies cited above and notes that the findings of those "older" studies are still widely accepted relevant principles in the economic discipline today.[16]

17.    Additionally, Staelin explains how the modern development of consumer search behavior and options available to consumers (e.g., smartphones, online shopping) has actually *spread* the presence of fictitious reference pricing, not extinguished it.[17] According to Staelin, "disclosure of the true normal price charged may be the only solution that could plausibly influence both consumer and firm behavior." *Id.* at 826. *See also id.* at 831 ("Identical firms, selling identical products, make positive profits because of their obfuscation strategy, and the likelihood of obfuscation grows as competition intensifies.").

18.    Consequently, retailers like Defendants, who understand that consumers are susceptible to a bargain, have a substantial financial interest in making consumers think they *are* getting a bargain, even when they are not. Contrary to the illusory bargains in Defendants' advertisements, consumers are not receiving *any* discount and are actually *overpaying* for Defendants' product because "[t]he magnitude of both real and fake discount[s] were significant predictors of demand above the effects of the actual sales price, ***with fake discounts having a substantially larger effect than real discounts***." Staelin, *supra*, at 835 (emphasis added).

---

[15] *Pricing and public policy*, *supra* note 13, at 7.

[16] *See* Staelin, *supra*, at 829 ("It is now well established that many consumers get extra utility beyond that associated with consuming the product from purchasing it on deal [] and that magnitude of this utility is a function of the size of the deal.") (emphasis added) (citations omitted).

[17] Staelin, *supra*, at 826. (explaining how the study "develop(s) a descriptive model explaining why fictitious reference pricing has spread instead of being extinguished by competition.").

**B.     Defendants Engage in a Fraudulent Price Discounting Scheme.**

19.    Defendants are a specialty retailer of men's, women's, and children's apparel. For years, Defendants have engaged in a fake discounting scheme that harms consumers by advertising their Gap Factory merchandise at discounted "sale" prices in their Gap Factory outlet stores and gapfactory.com. In short, Defendants market the "sale" prices as discounts from the "original" prices listed on the products' price tags for merchandise sold at Defendants' brick-and-mortar Gap Factory outlet stores. In most cases, the items are each accompanied by a placard sign immediately above them[18] advertising a "___% Off [the] LOWEST TICKETED PRICE." In other instances, the sale placards advertise a whole-price discount that is usually substantially less than the "original" price tag price. At Gap Factory outlets, the discount placard signs are printed on white card stock with bold, black lettering advertising the fake discount. Defendants do *not* advertise or otherwise disclose the date on which any item was last offered for its "original" price.

20.    The photos below demonstrate representative examples of Gap Factory's storewide practice in place at all Gap Factory stores. [19]



---

[18] In other cases, such as with table displays, the discount sign applies to several, typically similar, items.

[19] *See also* **Exhibit A** (additional photographic examples showing the extent and pervasiveness of Defendants' price-comparison advertising scheme at Gap Factory outlet stores).

21.     As shown in the above photos—and throughout **Exhibit A**—Defendants' "original" (or "ticket") prices are unaccompanied by any qualifying language that could arguably direct consumers to compare Defendants' reference price and purported discount to any other market outside of the particular factory store where it is being advertised. This reasonable impression is reinforced by Defendants' pervasive use of "___% OFF" advertisements, which denote limited-time discounts from *former* prices.[20] Thus, Defendants do not advertise "discounts" from any other stores, including their own Gap mainline stores.

22.     Additionally, Plaintiffs are informed and believe and thereon allege that all of the merchandise sold at Gap Factory outlet stores is manufactured for and sold exclusively at Gap Factory outlet stores.[21] *See* Gap, Inc., Annual Report (Form 10-K), at p. 9 (March 19, 2024) ("2024 10-K") ("Gap also serves value-conscious customers with exclusively designed collections for Gap Outlet and Gap Factory Stores."); *Is Gap Factory the same as Gap?*, Gap Factory, https://www.gapfactory.com/customerService/info.do?cid=1044824 (last accessed Oct. 25, 2024) ("Our in-house design team creates an exclusive line of casual-chic styles available only at Factory. We do not sell Gap overstock, last season's trends, or flawed products. You'll get everything you love about the Gap brand at a value you'll love even more.").

23.     Moreover, Defendants' reference prices are not styled as "Compare At" pricing representations. In those schemes an advertiser compares its prices to those of competitors using words such as "compare at" or "comparable value" on its price tags to qualify its reference prices. Both Defendants' exclusive and any non-exclusive Factory store items bear ticket prices unaccompanied by any qualifying language that would reasonably indicate a comparison to another market, and so consumers are not put on notice to seek out those comparisons.

---

[20] *See Vizcarra v. Michaels Stores*, Inc., 710 F. Supp. 3d 718, 725 (N.D. Cal. 2024) ("A reasonable consumer does not need language such as, 'Formerly $9.99, Now 40% Off $9.99,' or '40% Off the Former Price of $9.99,' to reasonably understand '40% off' to mean 40% off the former price of the product.") (quoting *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, at *4 (N.D. Cal. June 15, 2016)).

[21] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *see, e.g.*, *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015).

24.    With respect to Defendants' sales at gapfactory.com, Defendants engage in the online equivalent of their brick-and-mortar practice.[22] That is, Defendants perpetually advertise Gap Factory merchandise with an "original" price (black font) with a strikethrough on it (i.e., crossed out: e.g., ~~$19.99~~) next to a corresponding "__% Off" discount and a reduced "sale" price representing the advertised percentage off taken from the fictitious original price. The "__% Off" and "sale" price usually appear in red font, indicating the urgency with which consumers need to act if they wish to take advantage of the "savings." Indeed, like Defendants' in-store Gap Factory outlet products, the false reference prices advertised at gapfactory.com operate as a baseline for consumers to rely on to assess a product's value. Showing the discount percentage in red alongside this "original" price communicates to consumers that the product is being offered at a substantial discount from a former price and will return to that former price if the shopper fails to act promptly. The photos below illustrate this practice, which, except for variations on the "__% Off" discount on different products, is uniform across the e-commerce website, and appears on both list and product pages.[23]



---

[22] As discussed below in Section VI.D Plaintiffs' counsel confirmed that many (if not all) outlet products sold at gapfactory.com are the same as those available in-store.

[23] Attached hereto as **Exhibit B** are numerous additional snapshots from gapfactory.com depicting falsely discounted merchandise. Attached as **Exhibit C** are numerous snapshots of the website acquired from the Wayback Machine. Wayback Machine (accessible at https://wayback-api.archive.org/) is a well-regarded internet archive of websites and webpages as they existed at one point in time. In other words, while a website may update its content periodically, The Wayback Machine permits users to view it exactly as it appeared on the date the page snapshot is taken. The date of the snapshot is shown at the top of each page.



25. The Gap Factory products sold in-store and at gapfactory.com are substantially the same. There is also no meaningful difference in Defendants' Gap Factory outlet inventory—the same products are sold at every store and online and the same fraudulent pricing scheme is deployed uniformly. Both channels consist of exclusive, made-for-outlet products not sold in Gap mainline stores or department stores. Thus, Defendants are not offering a "discount" from their own or any competitor's merchandise for sale in the relevant market (or *any* market). Further, because the Factory outlet products in both the brick-and-mortar Gap Factory stores and gapfactory.com are never—or virtually never—offered for sale or actually sold at their "original" or "price tag" prices, those prices and their accompanying "discounts" are fraudulent: they are used solely to induce consumers to make purchases and spend more under the reasonable, but incorrect, belief that the merchandise was recently sold at its advertised reference price in either (1) the brick-and-mortar Gap Factory store, (2) gapfactory.com, or (3) the Gap mainline store (which sells higher quality Gap-branded merchandise) at a significant discount when, in fact, they are purchasing inferior quality, ***made-for-factory-outlet***, merchandise that has never been offered outside of a Gap Factory store and, even there, never (or virtually never) at the higher "original" price advertised on its price tag.

26. Even if Defendants did offer the Factory outlet products at their full reference price (which they do not), that offering would do little to legitimize Defendants' practice. That is because, for the advertised former price to be "actual, bona fide" and "legitimate" it must be the "price at which the article was offered to the public ***on a regular basis for a reasonably substantial period of time***." 16 C.F.R. § 233.1(a) (emphasis added). Nor would such rare offerings constitute the "prevailing market price" within the "three months next immediately preceding the publication of the advertisement," as is required by the FAL, Cal. Bus. & Prof. Code § 17501, "unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement[,]" which Defendants also fail to do on *all* advertisements. Rather, the advertised reference prices on Gap Factory merchandise are *not* the prices at which Defendants regularly (or ever) sell, or expect to regularly sell, the merchandise; they are merely a basis for misleading consumers into believing they are receiving a substantial discount.

27. In sum, Defendants' fake discount scheme is intended to (and does) increase Defendants' sales while depriving consumers of the benefit of their bargain and causing them to spend more money

than the Factory Store items are actually worth—the price they could command in the absence of the fake discount.[24] This conduct deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information and results in the illegal imposition of a price premium the Factory store merchandise could not and would not otherwise command, which consumers, like Plaintiffs, are duped into paying.

### C.    Defendants' Fraudulent Price Discounting Scheme Harms All Consumers.

28.    A product's reference price matters because it serves as a baseline upon which consumers perceive its value.[25] Empirical studies "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[26] Consumers are misled and incorrectly overvalue Defendants' Gap Factory products as a result of the false price comparisons. The products' actual sales prices, therefore, reflect consumers' overvaluation of them, which in turn permits Defendants to command inflated prices for them beyond what the market would otherwise allow. As discussed above, academic researchers have documented the relationship between reference prices and consumer behavior, as well as the resulting harm from *false* reference prices:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[27]

29.    Accordingly, all consumers who purchase Gap Factory merchandise are harmed by Defendants' pricing scheme because its impact pervades the entire market for Gap Factory merchandise. This is because, again, the artificially increased demand generated by Defendants' pricing scheme results in increased actual sales prices beyond what the products would command in the absence of the false

---

[24] Staelin, *supra*, at 826 ("It is now well accepted that many consumers get extra utility, beyond that associated with consuming a product, from purchasing it on deal [] and that the magnitude of this utility is a function of the size of the deal.").

[25] Richard Thaler, *supra* note 5, at 212.

[26] Jerry B. Gotlieb & Cyndy T. Fitzgerald, *supra* note 14, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

[27] Dhruv Grewal et al., *supra* note 11, at 46.

reference pricing scheme. Again, "the higher reference price stated alongside the selling price shift[s] the demand function outward, leading to higher average prices and thus higher margins." Staelin *et al.*, *supra*, at 835. Thus, all Gap Factory shoppers pay more regardless of their individual beliefs or purchasing decision processes. In other words, their subjective beliefs about the value of the products or the legitimacy of the purported discounts are inconsequential to the injury they incur when purchasing Defendants' Gap Factory merchandise. All consumers who purchase falsely discounted Gap Factory outlet products have overpaid and are deprived of the benefit of the bargain (i.e., the promised discount). Additionally, they will have paid a premium for merchandise that is worth less than its actual purchase price.[28] Plaintiffs and proposed Class members (defined below) thus suffered a common impact from Defendants' misconduct.

### D.    Investigation

30.    Plaintiffs' counsel has conducted a large-scale, comprehensive investigation into Defendants' fake discounting scheme at their Gap Factory outlet stores and online at gapfactory.com. Plaintiffs' counsel monitored items in Defendants' Gap Factory outlet stores in California on numerous days between July 18, 2022 and September 20, 2022. Plaintiffs' counsel recommenced the investigation in March of 2023, continued through at least the filing of the original complaint. This California investigation included visits to Defendants' Gap Factory stores located at the San Francisco Premium Outlets, Vacaville Premium Outlets, Carlsbad Premium Outlets, Las Americas Premium Outlets, Citadel Outlets, the Outlets at Orange, and the Gilroy Premium Outlets. Beginning on March 13, 2024, and ongoing through October 2024, Plaintiffs' counsel has made near-weekly visits to monitor prices in Oregon Gap Factory outlet stores located at the Woodburn Premium Outlets and the Columbia Gorge outlets. Plaintiffs' counsel has also investigated prices in the Gap Factory outlet store located at the Woodbury Common Premium Outlets in New York during this time. Plaintiffs' counsel's in-store investigation is based on at least forty-two (and counting) separate visits made to Defendants Gap Factory outlet stores across three states. Attached as **Exhibit D** to this Complaint is a list of exemplary products tracked in California and Oregon.

---

[28] N. Gregory Mankiw, *Essentials of Economics*, 66 (8th ed. 2015) ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also* Hal R. Varian, *Microeconomics Analysis*, 23-38, 144-57, 233-353, and 285-312 (3d ed. 1992).

31.    Notably, the overriding substance of Defendants' Factory outlet pricing scheme (i.e., the manner in which the reference prices and purported discounts are conveyed to shoppers) has appeared uniform at *every* location, regardless of what state it is in or when the observation was made.[29] The only thing that changed was the specific advertised discount and/or reference price on certain merchandise. Indeed, all products observed appear to have remained "on sale" throughout the investigation and "discounted" against a false reference price that has never been observed as the actual selling price. In other words, all items had price tags that were perpetually "discounted" by in-store signage indicating a large percentage off ("__% Off") or whole-price reduction discount. Accordingly, Plaintiffs are informed and believe and thereon allege that Gap Factory outlet store merchandise is never (or virtually never) offered for sale at its full "original" price—and certainly not "on a regular basis for a reasonably substantial period of time," as required by 16 C.F.R. § 233.1.

32.    Plaintiffs' counsel has also monitored Gap Factory outlet merchandise sold online at gapfactory.com during 2024. Gapfactory.com sells the same (or virtually the same) Gap Factory merchandise as the brick-and-mortar outlet stores in California and Oregon. Plaintiffs' counsel found that the merchandise for sale on gapfactory.com was subject to the same perpetual false discounting scheme as discovered in the brick and mortar stores. Indeed, everything offered on gapfactory.com appears to be always, if not virtually always, advertised at discounts from higher reference prices. This confirmed allegations in Section III.B. above—that items for sale on gapfacory.com are perpetually and uniformly priced with substantially "discounted" sale prices appearing next to both the "crossed out" (or "strikethrough") "original" price, and the purported discount "__% Off."

33.    Plaintiffs' counsel also researched gapfactory.com with the Wayback Machine. The website snapshots recorded by the Wayback Machine are consistent with the physical and online investigation. *See* **Exhibit C**. The website snapshots recorded by the Wayback Machine showed discounted prices on gapfactory.com merchandise across the several months before Plaintiffs' purchases on May 25, 2024 and September 10, 2024, therefore supporting Plaintiffs' allegation of perpetual fake discounts across the e-commerce platform, in addition to the brick-and-mortar Factory outlet stores.

---

[29] That is, the fake discounting scheme described above in Section III.B. has appeared uniformly implemented at each location. *See* **Exhibit A**.

34. Thus, the false discounting scheme used by Defendants on their Gap Factory outlet merchandise is uniformly and identically applied on all, or virtually all, of the Gap Factory products sold through Defendants' California and Oregon brick-and-mortar outlet stores and e-commerce website, gapfactory.com.

35. Despite Plaintiffs' counsel's best efforts at investigation, the full extent of Defendants' false and deceptive pricing scheme can only be revealed through a full examination of records, including historical transaction records, exclusively in Defendants' possession.

## IV.    PARTIES

### Plaintiffs

36. Plaintiff Cho is a California citizen who resides in Mountain View, California. On May 25, 2024, Plaintiff Cho shopped for clothing at the Gap Factory outlet store located at 447 Great Mall Dr., Milpitas, CA 95035. During Plaintiff Cho's time at the Gap Factory outlet store on May 25, 2024, she browsed several items before deciding on what items to purchase. While shopping, Plaintiff Cho noticed numerous signs within the Gap Factory outlet store advertising various "__% Off" discounts on items throughout the store.[30] In reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Cho purchased the following items from the Gap Factory store at the Milpitas Outlets on May 25, 2024:

| No. | Item: | False Reference Price: | Purported Discount | Purchase Price: |
|---|---|---|---|---|
| 1 | GFIT Brushed J (GapFit Brushed Tech Jersey Joggers) SKU 496329-011-0002 | $59.99 | 60% off ($35.99) | $24.00 |
| 2 | SL Ribbed Ruff (Ribbed Flutter Sleeve Top) SKU 434712-011-0003 | $34.99 | $16.00 off | $18.99 |
| 3 | 3PL Corvette (Chevrolet Corvette Graphic T-Shirt) SKU 402061-001-0003 | $34.99 | 50% off ($17.50) | $17.49 |
| 4 | SL Ribbed Ruff (Ribbed Flutter Sleeve Top) SKU 434712-051-0002 | $34.99 | $16.00 off | $18.99 |

---

[30] *See, e.g.*, **Exhibit A**, depicting extent of discount signs on display throughout Defendants' outlet stores.

37.    Indeed, after observing the original prices of the item and the accompanying sale prices, Plaintiff Cho believed she was receiving a significant discount on the items she had chosen. Her belief that the discounted prices on the items were limited and would not last was material and integral to her purchase decisions. On all products, the advertised discounts were a material representation to Plaintiff Cho, and she relied on them in making her purchase decisions. She would not have made the purchases were it not for the significant bargain she thought she was receiving. Plaintiff Cho has, therefore, suffered economic injury as a direct result of the Defendants' unlawful, unfair, and fraudulent false reference pricing scheme.

38.    As shown in **Exhibit E**, the total "original" price for all four items Plaintiff Cho purchased was $164.96, the purported discount was $85.49, and sales tax was $7.46.  Plaintiff Cho paid a total of $87.03. However, Plaintiff Cho did not receive the benefit of her bargain because the products she purchased were not worth the higher value represented by Defendants' baseless "original" prices.

39.    Plaintiff Maria Eagle is a citizen of Oregon and resides in St. Helens, Oregon. On September 10, 2024, Plaintiff Eagle shopped for clothing at the Gap Factory outlet store located at 1001 N. Arney Road, Ste. 104, Woodburn, Oregon 97071 (the "Woodburn Outlets"). While shopping at the Gap Factory outlet store, Plaintiff Eagle browsed several items before deciding on what items to purchase, and she noticed numerous signs within the Gap Factory outlet store advertising various "__% Off" discounts on items throughout the store.[31] After reviewing the advertised sale prices, Plaintiff Eagle decided to purchase the above listed below. Specifically, in reliance on Defendants' false and deceptive advertising, marketing and discount pricing scheme, Plaintiff Eagle purchased the following items from the Gap Factory outlet store (store number 07973) located at the Woodburn Outlets, on September 10, 2024, at approximately 1:28 p.m.:

| No. | Item: | False Reference Price: | Purported Discount | Purchase Price: |
|---|---|---|---|---|
| 1 | LS Standard OX<br>SKU 608574-141-1108 | $54.99 | 40% Off<br>($22.00) | $32.99 |
| 2 | LS Brushed UTI<br>SKU 545635-031-1108 | $59.99 | 40% Off<br>($24.00) | $35.99 |

---

[31] *See, e.g.*, **Exhibit A**, depicting extent of discount signs on display throughout Defendants' outlet stores.

40.     Indeed, after observing the original prices of the item and the accompanying sale prices, Plaintiff Eagle believed she was receiving a significant discount on the items she had chosen. Her belief that the discounted prices on the items were limited and would not last was material and integral to her purchase decisions. On all products, the advertised discounts were a material representation to Plaintiff Eagle, and she relied on them in making her purchase decisions. Plaintiff Eagle would not have made the purchases were it not for the significant bargain she thought she was receiving. Plaintiff Eagle has, therefore, suffered economic injury as a direct result of Defendants' unlawful, unfair, and fraudulent false reference pricing scheme.

41.     As shown in **Exhibit F**, the total "original" price for the two items Plaintiff Eagle purchased was $114.98, the purported discount was $46.00, and Plaintiff Eagle paid a total of $68.98.[32] For the reasons stated herein, Plaintiff Eagle did not receive the benefit of her bargain because the products she purchased were not worth the higher value represented by Defendants' baseless "original" prices.

42.     In addition to buying items they would not otherwise have purchased absent Defendants' false price discounts, Plaintiffs also suffered economic injury by overpaying for the products they purchased as described herein. And it was Defendants' false reference pricing scheme and attendant deception that caused Plaintiffs to overpay. Despite Plaintiffs' original belief that each product purchased was discounted and thus that its value was significantly greater than the sale price for which it was purchased, Plaintiffs in actuality paid an *inflated* price for the products they purchased. That is, the items Plaintiffs purchased were all worth less than the amount Plaintiffs paid for them, and if Defendants had not employed the falsely advertised "original" prices for the four items Plaintiffs purchased, then those items would not have commanded such high, inflated prices. The price premium Plaintiffs paid—i.e., the difference between the amount Plaintiffs paid and the value received, or the but-for price the products would have commanded absent the false discounting scheme, can be isolated through multiple expert-based models, including hedonic regression, conjoint analysis, and market simulation, which Plaintiffs will further describe in their motion to certify this action as a class action pursuant to Fed. R. Civ. P. 23.

**<u>Plaintiffs Have Standing for Injunctive Relief and Lack an Adequate Remedy at Law</u>**

---

[32] Oregon does not charge a statewide sales tax on clothing purchases.

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

43.     Plaintiffs do not have an adequate remedy at law, and are susceptible to harm reoccurring, and therefore require an injunction, because they cannot be certain that Defendants will have corrected this deceptive pricing scheme, and they strongly desire to shop for additional Gap merchandise at either gapfactory.com or brick-and-mortar Gap Factory retail stores because they like the brand and the clothing styles offered. Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Gap Factory outlet stores, Plaintiffs will be unable to parse what prices are inflated and untrue, and what prices are not. Plaintiffs simply do not have the resources to ensure that Defendants are complying with state and federal law with respect to their pricing, labeling, and/or advertising of their outlet merchandise.

44.     Further, because of the wide selection of merchandise available at Defendants' outlet stores, the sheer volume of Gap Factory products involved in Defendants' deceit (i.e., virtually all of them), and the likelihood that Defendants may yet develop and market additional Factory outlet merchandise items for sale, Plaintiffs may again, by mistake, purchase a falsely discounted product at a Gap Factory outlet store under the reasonable, but false, impression that Defendants had corrected the scheme and that their reference price advertisement represented a *bona fide* former price at which the item was previously offered for sale by Defendants. However, without a substantial, time-consuming, and costly investigation, Plaintiffs will have no way of knowing whether Defendants have deceived them again.

45.     Absent an equitable injunction enjoining Defendants from continuing in the unlawful course of conduct alleged herein, Plaintiffs, members of the Classes, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendants' ongoing and deceptive conduct that cannot be remedied with monetary damages. Accordingly, Plaintiffs, members of the Classes, and the general public lack an adequate remedy at law and an injunction is the only form of relief that will guarantee Plaintiffs and other California and Oregon consumers the appropriate assurances going forward.

46.     Moreover, Plaintiffs also lack an adequate remedy at law with respect to their claims for equitable restitution because they have not yet retained an expert to determine whether an award of damages can or will adequately remedy their monetary losses caused by Defendants. Further, the CLRA claim brought by Plaintiff Cho on behalf of the California Class (which is the only claim that could

possibly afford her and the California Class the legal remedy of damages) is based on subjective criteria—whether Defendants made false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions. *See* Cal. Civ. Code § 1770(a)(13). In contrast, Plaintiff Cho's FAL claim (which only entitles her and the California Class to recover monetary restitution) is based on purely *objective* criteria—i.e., whether Defendants' former prices were "the prevailing market price within three months preceding the advertised discount. *See* Cal. Bus & Prof. Code § 17501. Thus, Plaintiff Cho alleges a substantially different theory of liability with respect to her claim for equitable restitution under the FAL than she does to support her claim for damages under the CLRA. If Plaintiff Cho is ultimately successful on her more objective FAL claim, but not on her more subjective CLRA claim, she and the California Class will have *no remedy at law*, thus justifying her right to obtain equitable remedies in the alternative.

47.    Further, both Plaintiffs may seek damages under the Oregon UTPA and CLRA based on one theory (such as a benefit-of-the-bargain methodology or full refund theory), and restitution based on another theory (such as a price premium or full refund theory), which will likely yield different results. Particularly, as legal damages focus on remedying the loss to the Plaintiffs, and equitable restitution focuses on the wholly distinct purpose of restoring monies wrongly acquired by the Defendants, legal damages may be inadequate to remedy Plaintiffs' monetary losses because Plaintiffs do not know at this juncture, and are certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiffs' losses.

**Defendants**

48.    Plaintiffs are informed and believe, and upon such information and belief allege, Defendant Gap, Inc., d/b/a Gap Factory, is a Delaware corporation with its principal executive offices in San Francisco, California. Plaintiffs are informed and believe that Defendant Gap, Inc., d/b/a Gap Factory, owns and operates Gap Factory outlet stores in both California and Oregon, and it advertises, markets, distributes, and/or sells clothing and accessories in California, Oregon, and throughout the United States.

49.    Defendant Gap (Apparel) LLC is a for-profit limited liability company formed and existing under the laws of the State of California with its principal place of business at 2 Folsom Street, 13th Floor, San Francisco, California 94105, and thus is a citizen of California.

50.     Defendant Gap International Sales, Inc. is a for-profit corporation formed and existing under the laws of the State of Delaware with its principal place of business at 2 Folsom Street, 13th Floor, San Francisco, California 94105, and thus is a citizen of Delaware and California.

51.     All Defendants have a parent-subsidiary relationship, in that Defendants Gap (Apparel) LLC, and Gap International Sales, Inc., are each wholly-owned subsidiaries of Defendant The Gap, Inc.

52.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Classes as alleged herein. Plaintiffs will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

53.     Defendants know that their reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California, Oregon, and federal law.

54.     Defendants fraudulently concealed from and intentionally failed to disclose to Plaintiffs and other members of the proposed Classes the truth about their advertised discount prices and former reference prices. Defendants concealed from consumers the true nature and quality of the products sold at their Gap Factory outlet stores.

55.     Defendants intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to induce and provoke Plaintiffs and the proposed Classes to purchase Gap Factory outlet products.

56.     At all relevant times, Defendants have been under a duty to Plaintiffs and the proposed Classes to disclose the truth about their false discounts.

## V.     CLASS ALLEGATIONS

57.     Plaintiffs bring this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Classes against Defendants:

**California Class**

All persons who, while within the State of California and within the applicable statute of limitations preceding the filing of this action (the "California Class Period"), purchased from a Gap Factory store located in California or from gapfactory.com one or more products advertised at a discount from an advertised reference price and who have not received a refund or credit for their purchase(s).

**Oregon Class**

All persons who, while within the State of Oregon and within the applicable statute of limitations preceding the filing of this action (the "Oregon Class Period"), purchased from a Gap Factory store located in Oregon or from gapfactory.com one or more products advertised at a discount from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Classes are Defendants, as well as their officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more sub-classes, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

58.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain, at least, hundreds of thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs but can be reasonably estimated based on Defendants' business records.

59.     ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.     whether, during the California and Oregon Class Periods, Defendants used falsely advertised reference prices on their Gap Factory outlet product labels and falsely advertised price discounts on merchandise sold in their outlet stores;

b.     whether Defendants ever offered items for sale or sold items at their advertised reference price, and if so, for how long;

c.     whether, during the respective Class Periods, the original price advertised by Defendants was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.      whether Defendants' purported sale prices advertised in their Gap Factory outlet stores reflected any actual discounts or savings;

e.      whether Defendants' purported percentage-off discounts advertised in their Gap Factory outlet stores reflected any actual discounts or savings;

f.      whether Defendants made false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions;

g.      whether Defendants' alleged conduct constitutes violations of California, Oregon, and/or federal pricing regulations;

h.      whether Defendants engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

i.      whether Plaintiffs and Class members are entitled to damages and the proper measure of that loss;

j.      whether Plaintiff Eagle and the Oregon Class members are entitled to statutory damages pursuant to Or. Rev. Stat. § 646.638 *et seq.* and the proper measure of those damages; and

k.      whether an injunction is necessary to prevent Defendants from continuing to use false, misleading or illegal price comparisons.

60.     ***Typicality***: Plaintiffs' claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendants' false and deceptive price advertising scheme, as alleged herein. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

61.     ***Adequacy***: Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiff Cho is a member of the California Class, and Plaintiff Eagle is a member of the Oregon Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes they seek to represent.

62.     ***Superiority***: The nature of this action and the nature of laws available to Plaintiffs and the Classes make the use of the class action format a particularly efficient and appropriate procedure to afford

relief to them and the Classes for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent a class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendants will be permitted to retain the proceeds of their fraudulent and deceptive misdeeds.

63.     All Class members, including Plaintiffs, were exposed to one or more of Defendants' misrepresentations or omissions of material fact claiming that former reference prices were legitimate. Due to the scope and extent of Defendants' consistent false sale prices, and advertising scheme, disseminated in a years-long campaign to California and Oregon consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Classes. In addition, it can be reasonably presumed that all Class members, including Plaintiffs, affirmatively acted in response to the representations contained in Defendants' false advertising scheme when purchasing merchandise sold at Gap Factory outlet stores or online at gapfactory.com.

64.     Plaintiffs are informed that Defendants keep extensive computerized records of their Gap Factory outlet customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendants have one or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
***(On Behalf of Plaintiff Cho and the California Class)***

65.     Plaintiff Cho repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

66. Plaintiff Cho brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of the UCL, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

67. The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200.

68. The UCL imposes strict liability. Plaintiff Cho and members of the proposed California Class need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

69. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

70. Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendants' acts and practices offended an established public policy of transparency in pricing, including regulations enacted by the FTC, and they constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

71. The harm emanating from this practice to Plaintiff Cho and members of the proposed California Class outweighs any utility it provides because Defendants' practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

72. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

73. Defendants' acts and practices alleged above constitute fraudulent business acts or practices as Defendants have deceived Plaintiff Cho and members of the proposed California Class and

are highly likely to deceive members of the consuming public. Plaintiff Cho relied on Defendants' fraudulent and deceptive representations regarding their false or outdated "original prices" for products sold by Defendants at their Gap Factory outlet stores and online at gapfactory.com. These misrepresentations played a substantial role in Plaintiff Cho's and members of the proposed California Class's decision to purchase products at a purportedly steep discount, and Plaintiff Cho would not have purchased the products without Defendants' misrepresentations.

### *"Unlawful" Prong*

74.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

75.    Defendants' acts and practices alleged above constitute unlawful business acts or practices as Defendants have violated state and federal law in connection with their deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, like Defendants', are described as deceptive practices that would violate the FTCA:

(a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

76.    In addition, Defendants' acts and practices violate California law, which expressly prohibits false former pricing schemes. The FAL, Cal. Bus. & Prof. Code § 17501, entitled "*Worth or value; statements as to former price*," states:

> For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.
>
> ***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501 (emphasis added).

77.    Defendants violate § 17501 because they advertise items, including the items that Plaintiff Cho purchased as described herein, with a former "original" or "Ticketed Price" that greatly exceeds the prevailing market price of those items. Defendants' own sales records will show that they normally sell their products, including the items purchased by Plaintiff Cho, at prices substantially lower than the advertised former "original" or "Ticketed Price," thereby establishing that those prices exceed the prevailing market price of Defendants' merchandise in violation of Cal. Bus. & Prof. Code § 17501.

78.    As detailed in the Third Cause of Action below, the CLRA, Cal. Civ. Code § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

79.    As detailed herein, and for the same reason that Defendants' acts and practices violate the FTCA and the FAL, they also violate the CLRA.

80.    Defendants' practices, as set forth above, misled Plaintiff Cho, and are likely to mislead the proposed California Class and the public in the future. Consequently, Defendants' practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

81.    Defendants' violations of the UCL, through their unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat to Plaintiff Cho, members of the proposed California Class, and the public who, if Defendants' false pricing scheme is permitted to continue, will be deceived into purchasing products based on illegal price comparisons. These false comparisons created phantom

markdowns and led to financial harm for consumers like Plaintiff Cho and the members of the proposed California Class as described herein. Because of the surreptitious nature of Defendants' deception, these injuries cannot be reasonably avoided and will continue to be suffered by the consuming public absent a mandated change in Defendants' practice.

82.     Pursuant to Bus. & Prof. Code § 17203, Plaintiff Cho and members of the proposed California Class are entitled to preliminary and permanent injunctive relief enjoining Defendants from continuing to engage in this unfair competition alleged above, as well as disgorgement and restitution to Plaintiff Cho and the proposed California Class of all Defendants' revenues wrongfully obtained from them as a result of Defendants' unfair competition, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION
### Violation of California's False Advertising Law ("FAL")
### CAL. BUS. & PROF. CODE §§ 17500, *et seq.*
### *(On Behalf of Plaintiff Cho and the California Class)*

83.     Plaintiff Cho repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

84.     Plaintiff Cho brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of California's FAL, Cal. Bus. & Prof. Code §§ 17500, *et seq*.

85.     Cal. Bus. & Prof. Code § 17500 generally provides:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

(emphasis added).

86.     The "intent" required by section 17500 is the intent to make or disseminate personal property (or cause such personal property to be made or disseminated), and not the intent to mislead the public in the making or dissemination of such property.

87.     More specifically, the FAL provides:

no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

Cal Bus. & Prof. Code § 17501.

88.     Defendants' routine practice of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendants' average and/or most common actual sale price), constitutes an unfair, untrue, and misleading practice in violation of the FAL. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendants' Gap Factory outlet stores were worth more than they actually were.

89.     As a direct and proximate result of Defendants' misleading and false advertisements, as well as Defendants' deceptive and unfair acts and practices made during the course of Defendants' business, Plaintiff Cho and members of the proposed California Class suffered economic injury.

90.     Plaintiff Cho and members of the proposed California Class request that this Court order Defendants to restore this money to Plaintiff Cho and the proposed California Class, and to enjoin Defendants from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff Cho, members of the proposed California Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

### THIRD CAUSE OF ACTION
#### Violation of California's Consumers Legal Remedies Act ("CLRA")
#### CAL. CIV. CODE § 1750, *et seq.*
#### (On Behalf of Plaintiff Cho and the California Class)

91.     Plaintiff Cho repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

92.     Plaintiff Cho brings this claim individually and on behalf of the members of the proposed California Class against Defendants for violations of the CLRA, Cal. Civ. Code § 1750, *et seq*.

93.     Plaintiff Cho and each member of the proposed California Class are "consumers" as defined by Cal. Civ. Code § 1761(d). Defendants' sale of products at their Gap Factory outlet stores were

"transactions" within the meaning of Cal. Civ. Code § 1761(e). The products purchased by Plaintiff Cho and members of the proposed California Class are "goods" or "services" within the meaning of Cal. Civ. Code § 1761(a)-(b).

94.     Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiff Cho and members of the proposed California Class which were intended to result in, and did result in, the sale of products sold at their Gap Factory outlet stores and gapfactory.com:

      a.     advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

      b.     making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

95.     Plaintiff Cho is a consumer who has suffered economic injury and damages, including benefit of the bargain damages, as a result of Defendants' use and employment of the false and misleading reference pricing alleged herein. Pursuant to Cal. Civ. Code § 1780(a), Plaintiff Cho therefore seeks an order enjoining such methods, acts, or practices as well as any other relief the Court deems proper. Plaintiff Cho additionally seeks costs and reasonable attorney's fees pursuant to Cal. Civ. Code § 1780(e).

96.     On July 12, 2024, Plaintiff Cho, through counsel, sent a CLRA demand letter by certified mail to Defendants that provided notice of Defendants' violation of the CLRA and demanded Defendants correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendants refused to do so, Plaintiff would file a complaint seeking damages in accordance with the CLRA. To date, Defendants have not rectified their unlawful practices identified in the CLRA demand letter and complained of herein. Thus, Plaintiff Cho is seeking actual, punitive, and statutory damages, as appropriate against Defendants.

97.     Filed concurrently is a declaration of venue pursuant to Cal. Civ. Code §1780(d).

**FOURTH CAUSE OF ACTION**
**Violation of Oregon's Unlawful Trade Practices Act ("UTPA")**
**OR. REV. STAT. § 646.605, *et seq.***
***(On Behalf of Plaintiff Eagle and the Oregon Class)***

98.     Plaintiff Eagle repeats and re-alleges the allegations contained in paragraphs 1-64 above, as if fully set forth herein.

99.     Plaintiff Eagle brings this claim individually and on behalf of the members of the proposed Oregon Class against Defendants for violations of the UTPA, Or. Rev. Stat. § 646.605 *et seq.*

100.     The UTPA is Oregon's principal consumer protection statute. As the Supreme Court of Oregon has explained:

> The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself. It allows recovery of actual damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. . . . The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit . . . . the legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute.

*Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or. 127, 134-36, 690 P.2d 488 (1984). A private plaintiff may also seek an injunction "as may be necessary to ensure cessation of unlawful trade practices." Or. Rev. Stat. § 646.636.

101.     Defendants are each a "person," as defined by Or. Rev. Stat. § 646.605(4). Defendants are engaged in "trade" and "commerce" in Oregon by offering for sale goods with reference prices and discounts that directly or indirectly affect the people of Oregon, as defined by Or. Rev. Stat. § 646.605(8). The Factory outlet products advertised by Defendants with reference prices and discounts are "goods" that are or may be obtained primarily for personal, family or household purposes, as defined by Or. Rev. Stat. § 646.605(6). Defendants' representations of reference prices and discounts in their outlet stores are "advertisements" as defined by Or. Rev. Stat. § 646.881(1). Defendants' use of reference prices and advertised discounts are "price comparisons" as defined by Or. Rev. Stat. § 646.881(2).

102.     Plaintiff Eagle and the Oregon Class members purchased the goods advertised by Defendants with reference prices and discounts for personal, family or household purposes.

103. The unlawful methods, acts and practices pled herein were committed in the course of Defendants' business. Or. Rev. Stat. § 646.608(1).

104. Defendants' unlawful methods, acts and practices pled herein were "willful violations" of Or. Rev. Stat. § 646.608 because Defendants knew or should have known that their conduct was a violation, as defined by Or. Rev. Stat. § 646.605(10).

105. Defendants' reference prices are representations of Defendants' own "former prices," as defined by Or. Rev. Stat. § 646.885.

106. Defendants' methods, acts and practices, including Defendants' misrepresentations, active concealment and failures to disclose, violated and continue to violate the UTPA in ways including, but not limited to, the following:

     a. Defendants represented their goods had characteristics or qualities that the goods did not have (specifically, Defendants represented that the goods had a value equal to the reference price, when in fact they did not and instead had a much lower true value) (Or. Rev. Stat. § 646.608(1)(e));

     b. Defendants advertised their goods with intent not to provide the goods as advertised (specifically, Defendants represented that the goods are regularly offered and sold at, and therefore had a value equal to the reference price, when in fact they did not and instead had a much lower true value—even lower than the "discounted" actual sales price) (Or. Rev. Stat. § 646.608(1)(i));

     c. Defendants made false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions (Or. Rev. Stat. § 646.608(1)(j));

     d. Defendants engaged in price comparison advertising in violation of Or. Rev. Stat. § 646.883(2) by failing to comply with Or. Rev. Stat. § 646.608(1)(j) and Or. Rev. Stat. § 646.608(4) (Or. Rev. Stat. § 646.608(1)(ee));

     e. Defendants engaged in price comparison advertising in violation of Or. Rev. Stat. § 646.885(2) by using terms such as "____ percent discount," "$____ discount," "____ percent off" and/or "$____ off" where the reference price was not in fact Defendants' own former price (Or. Rev. Stat. § 646.608(1)(ee)); and

f.    Defendants engaged in other unfair or deceptive conduct in trade or commerce, as described herein (Or. Rev. Stat. § 646.608(1)(u); Or. Rev. Stat. § 646.608(4)).

107.    With respect to omissions, Defendants at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Defendants had exclusive knowledge of material information that was not known to Plaintiff Eagle and the Oregon Class; (b) Defendants concealed material information from Plaintiff Eagle and the Oregon Class; and/or (c) Defendants made partial representations which were false and misleading absent the omitted information.

108.    Defendants' misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

109.    Defendants' misrepresentations and nondisclosures are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

110.    Defendants engaged in the reckless or knowing use or employment of the unlawful methods, acts or practices alleged herein which have been declared unlawful by Or. Rev. Stat. § 646.608.

111.    As a direct, substantial and/or proximate result of Defendants' conduct, Plaintiff Eagle and the Oregon Class members suffered compensable and ascertainable losses.

112.    Plaintiff Eagle and the Oregon Class members would not have purchased the products at the prices they paid if they had known that the advertised reference prices and discounts were false.

113.    Defendants' false reference pricing scheme fraudulently increased demand from consumers. This fraud artificially raised consumer demand for Defendants' merchandise, thereby shifting the demand curve outward and enabled Defendants to charge higher prices than they otherwise could have charged.

114.    The products that Plaintiff Eagle and Oregon Class members purchased were not, in fact, worth as much as Defendants represented them to be worth, or the actual sales price that Plaintiff Eagle and Oregon Class members paid for them.

115.    Plaintiff Eagle seeks on behalf of herself and the Oregon Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages; (3) appropriate

equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to Or. Rev. Stat. § 646.638 et seq.

116.     The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendants' conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff Eagle seeks an order enjoining Defendants from committing such unlawful practices pursuant to Or. Rev. Stat. § 646.638(8)(c); Or. Rev. Stat. § 646.636.

117.     The balance of the equities favors the entry of permanent injunctive relief against Defendants. Plaintiff Eagle, the Oregon Class members and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendants. Plaintiff Eagle, the Oregon Class members and the general public lack an adequate remedy at law. A permanent injunction against Defendants is in the public interest. Plaintiff Eagle is informed and believes and thereon alleges that Defendants' unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendants will or may continue to injure Plaintiff Eagle and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendants' unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

118.     Defendants' conduct has caused substantial injury to the general public. Plaintiff Eagle individually seeks public injunctive relief to protect the general public by putting an end to Defendants' false reference price advertising, false discounts and omissions.

119.     This action was brought "within one year after the discovery of the unlawful method, act or practice." Or. Rev. Stat. § 646.638(6). The applicable limitations period is expansive and extends back many years based on the "discovery" rule explicitly provided for in the Oregon Unlawful Trade Practices Act at Or. Rev. Stat. § 646.638(6). Defendants' unlawful false discounting practices have been pervasive at their Oregon stores—and at the core of their marketing plan—for many years (the exact length of time will be subject to discovery and proof).

120.     Plaintiff Eagle and the Oregon Class members did not know, and could not have known, that these reference prices and discount representations were false. As the Oregon Supreme Court has explained, "[i]n general terms, a cause of action does not accrue under the discovery rule until the claim

has been discovered or, in the exercise of reasonable care, should have been discovered." *FDIC v. Smith*, 328 Or. 420, 428, 980 P.2d 141 (1999); *see also Saenz v. Pittenger*, 78 Or.App. 207, 211-12, 715 P.2d 1126 (1986) (UTPA statute of limitations begins running when plaintiff knows or should have known of the allegedly unlawful conduct).

121.    By Defendants' design, their false advertising scheme in its very nature is hidden and virtually impossible for the typical consumer to discover. Consumers who shopped at Defendants' stores have no reasonable or efficient way of knowing the true daily price histories and past selling prices for the products they viewed and purchased without substantial, time-consuming, and costly investigation. Thus, Oregon consumers have, and for years have had, no way to know that the prices printed on the product price tags were fictitious and inflated and that the advertised discounts were false. Consumers have, and for years have had, no way to know that Defendants' false discounting practices extend across all, or virtually all, of Defendants' merchandise.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and on behalf of the other members of the Classes, requests that this Court award relief against Defendants as follows:

a.    an order certifying the Classes, designating Plaintiff Cho as the Class Representative of the California Class, designating Plaintiff Eagle as the Class Representative of the Oregon Class, and their counsel as Class Counsel for both Classes;

b.    an order that the discovery rule, pursuant to, without limitation, Or. Rev. Stat. § 646.638(6), applies and that the applicable limitations period—and the corresponding Class Period for the Oregon Class—extends back to the very first date that Defendants began engaging in the unlawful conduct alleged herein;

c.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of their unlawful, unfair, and fraudulent business practices described herein;

d.    awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing

Defendants to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

       e.    ordering payment of damages as permitted by law, including actual, compensatory, benefit of the bargain, and/or statutory damages, to the full extent permitted by law;

       f.    retaining jurisdiction to monitor Defendants' compliance with permanent injunctive relief;

       g.    ordering Defendants to engage in a corrective advertising campaign;

       h.    awarding attorneys' fees and costs; and

       i.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: November 7, 2024

LYNCH CARPENTER, LLP

By:  */s/ Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Matthew J. Zevin (SBN 170736)
mattz@lcllp.com
Connor J. Porzio (SBN 351998)
connor@lcllp.com
1234 Camino Del Mar
Del Mar, CA 92014
Tel:   619-762-1910
Fax:   858-313-1850

*Attorneys for Plaintiffs and*
*Proposed Class Counsel*

PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT